UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**COUNTY OF OSWEGO INDUSTRIAL**
**DEVELOPMENT AGENCY,**

**Plaintiff,**

**–v–**                                                      **5:05-CV-926**

**FULTON COGENERATION ASSOCIATES, LP.,**
**LIONS CAPITAL MANAGEMENT, LLC, aka LION**
**CAPITAL MANAGEMENT, LLC, FIMAB,**
**PROMENEUR & HAUSMANN, INC., EL PASO**
**MERCHANT ENERGY-PETROLEUM COMPANY.,**
**and ANR VENTURE FULTON COMPANY,**

**Defendants.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:

Hiscock & Barclay, LLP
Robert B. Liddell, Esq., of Counsel
One Park Place
300 South State Street
Syracuse, New York  13221
Attorneys for Plaintiff

Nixon, Peabody LLP
Daniel J. Hurteau, Esq., of Counsel
Omni Plaza, Suite 900
30 South Pearl Street
Albany, New York  12207
Attorneys for El Paso Merchant Energy-Petroleum
Company and ANR Venture Fulton Company

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Presently before the Court is a motion for summary judgment (Dkt. No. 136) by plaintiff,

the County of Oswego Industrial Development Agency ("COIDA") against the two remaining

defendants in this action, ANR Venture Fulton Company ("ANR") and El Paso Merchant

Energy-Petroleum Company ("El Paso") (referred to collectively herein as "defendants").  This

Court previously issued an Order (Dkt. No. 172) on COIDA's motion to the extent of granting

summary judgment on the issue of liability as against Fulton Cogeneration Associates, LP

("FCA"), Lions Capital Management, LLC, a/k/a Lion Capital Management, LLC ("Lions"), and

Fimab, Promeneur & Hausmann, Inc. ("Fimab"); the Court reserved decision as to ANR and El

Paso.[1]  COIDA also moves (Dkt. No. 176) for an award of attorneys' fees and costs.  Also

pending is defendants' cross motion for summary judgment and indemnification (Dkt. No. 142).

As set forth below, the Court grants COIDA's motion for summary judgment (Dkt. No.

136) against defendants ANR and El Paso in the sum of $4,728,799.08, plus interest from March

31, 2005.  The Court grants COIDA's motion (Dkt. No. 176) for attorneys' fees in the sum of

$271,636.00, plus costs of $521,162.99.  COIDA is also entitled to recover judgment against

FCA, Lions, and Fimab in the sum of $4,728,799.08, plus interest from March 31, 2005, plus

attorneys' fees of $271,636.00, plus costs of $521,162.99, and the Judgment awarded herein shall

amend the prior Judgment (Dkt. No. 174) accordingly.  Further, the Court grants the cross motion

(Dkt. No. 142) to the extent that ANR and El Paso are awarded indemnification in the sum of

$649,428.90 on their cross claim against Lions and Fimab; the cross motion is otherwise denied.


**FACTS**

The following facts are undisputed unless otherwise noted.  On February 1, 1991, COIDA

---

[1] ANR and El Paso did not oppose COIDA's motion insofar as it sought summary judgment
against FCA, Lions, and Fimab.

-2-

and FCA entered into an agreement for the redevelopment of a cogeneration facility, known as

Fulton Cogeneration Facility ("FC Facility"), located in the City of Fulton, County of Oswego.

COIDA and FCA entered into a Lease Agreement ("Lease") whereby FCA assigned its leasehold

interest in the FC Facility to COIDA, which leased it back to FCA to develop.  The Lease

specifies that FCA is "a limited partnership duly organized and validly existing under the laws of

the State of New York."  The Lease is signed on behalf of FCA as follows: "Fulton Cogeneration

Associates, by ANR Venture Fulton Company, the Managing Partner for Fulton Cogeneration

Associates, by James W. Whalen, Vice President."  ANR was the general partner of FCA.

Also on February 1, 1991, COIDA and FCA executed a Payment in Lieu of Taxes

Agreement ("PILOT Agreement").  Like the Lease, the PILOT Agreement identifies FCA as a

New York limited partnership and is signed on behalf of FCA by Whalen, ANR's Vice President.

Section 6.3(b) of the Lease expressly incorporates by reference the PILOT Agreement as

follows:

> The Company [FCA] has agreed to pay certain amounts in lieu of taxes, the
> provisions of which are set forth in the PILOT Agreement, and the Company
> hereby agrees to observe, perform and comply with all conditions, obligations
> and provisions thereof, and the terms thereof are incorporated herein by
> reference.

Under section 10.1(a)(1) of the Lease, FCA's failure "to pay or cause to be paid, when

due, after five business day's written notice the amounts specified pursuant to section ... 6.3(b)"

constitutes an "event of default."  One of COIDA's remedies on default is set forth in section

10.2(a)(1), as follows:

> [COIDA may] [d]eclare, by written notice to the Company [FCA] ... to be
> immediately due and payable, whereupon the same shall become immediately
> due and payable:
> (x) rent .... (y) all other payments or amounts due or to become due to any

-3-

person under this Lease Agreement, the Agency Agreement and the Financing documents[.]

The PILOT Agreement provides that "the Company [FCA] agrees to pay to the Agency [COIDA], directly, an annual sum in lieu of City, County and School District Real Estate Taxes and assessments in accordance with the following schedule[.]"  The schedule lists 15 fixed annual payments, the first of which is due March 31, 1992, with payments due each March 31 thereafter. Starting in the sixteenth year, the FC Facility was to be "taxed per assessment[.]"  The PILOT Agreement provides in the sixth paragraph:

> The Company [FCA] reserves the option to cancel this in lieu of taxes agreement and to pay to the Agency [COIDA] an amount equal to the actual tax assessment which would be due on the property based upon the assessed value fixed by the assessors and the current tax rate applicable for the City, County and School taxes in the area.

Through two mergers, El Paso succeeded ANR as FCA's general partner in January 2001, thus undertaking FCA's obligations under the Lease and PILOT Agreement.  El Paso sold its general and limited partnership interests in FCA to Lions on September 23, 2004.  As of September 23, 2004, FCA had made all required payments under the PILOT Agreement.

By letter to COIDA dated January 21, 2005, Lions stated it was "hereby withdrawing from the Tax Pilot Agreement, effective immediately."  Under the schedule of payments set forth in the PILOT Agreement, the 14th payment, due March 31, 2005, would have been $1,481,533. According to the affidavit of Dianne Moore, Tax Assessor for the City of Fulton at the times in issue, the 2004 assessed value on the FC Facility was $46 million, and the total tax obligation thereon for the 2004-2005 tax year was $2,364,399.54.

FCA made no payment on March 31, 2005.  On July 25, 2005, COIDA sent to FCA (c/o ANR and Lions) a letter headed "Notice of Termination of Lease."  It accelerated the remaining

payment due under the PILOT schedule and terminated the Lease effective August 26, 2005.  As a

a result of the termination of the Lease, the value of the FC Facility was reassessed on August 26, 2005 to $2,751,075, according to the affidavit of the tax assessor, Dianne Moore.

## DISCUSSION

**Standard on summary judgment**

Summary judgment is appropriate only when there is no genuine issue with regard to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in that party's favor. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005).  The Court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**Whether COIDA impliedly agreed to discharge defendants**

On the present motion for summary judgment, COIDA claims that, as former general partners of FCA, defendants ANR and El Paso are liable to COIDA for FCA's obligations under the Lease and PILOT Agreement.  It is undisputed that ANR was the general partner of FCA in 1991 when the Lease and PILOT Agreement were signed; thus, ANR was liable to COIDA under both agreements.  *See* N.Y. Partnership Law, § 26(a)(2).  It is further undisputed that ANR merged into Coastal Refining & Marketing, Inc. ("Coastal") in 1998, that Coastal became El Paso in 2001, and that El Paso assigned its general partnership interest in FCA to Lions on September

-5-

23, 2004.[2]  As this Court held in a prior decision, ANR did not free itself from its obligations to COIDA under the Lease and PILOT Agreement simply by merging into Coastal and then El Paso, nor did El Paso extinguish its obligation to COIDA simply by transferring its interest in FCA to Lions.  *See County of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs.*, 2007 WL 838975, *1 (N.D.N.Y. 2007) (denying motion by ANR and El Paso to dismiss under 12(b)(6)).

Defendants argue that the assignment of El Paso's general partnership interest in FCA to Lions was, in effect, a dissolution of FCA, resulting in the discharge of defendants' obligations as general partners.  Under New York law, "[t]he dissolution of [a] partnership does not of itself discharge the existing liability of any partner."  N.Y. Partnership Law, § 67(1).  A partner may, however, be discharged from liability upon dissolution by an agreement to that effect between the partner, the partnership creditor, and the partnership continuing the business; "such agreement may be inferred from the course of dealing between the creditor having knowledge of the dissolution and the person or partnership continuing the business."  *Id.*, § 67(2).  According to defendants, an agreement to discharge them and substitute Lions in their place as obligor may be inferred from COIDA's conduct in connection with El Paso's transfer of its interest in the FC Facility to Lions.  Defendants rely on evidence to the effect that COIDA encouraged the transfer of El Paso's interest in the FC Facility to Lions and that, once the transfer occurred, COIDA acknowledged and accepted Lions' status as successor to El Paso.

In reply, COIDA contends that, by virtue of a provision in the FCA partnership agreement, no dissolution occurred, and that, in any event, no agreement to discharge defendants

---

[2] The only other partner in FCA at the time, Rensselaer Plant Holdco, LLC ("Rensselaer"), a limited partner, transferred its interest to Fimab, a Lions affiliate, on the same date.

may be inferred from its conduct.  COIDA avers that it had no knowledge of the specific terms of

the transfer and that its conduct does not support an implied agreement under section 67(2).

COIDA submits affidavits from its general counsel and an officer spelling out the information

COIDA possessed and COIDA's conduct at the relevant times.

As set forth below, the Court concludes that, even assuming that the assignment of El

Paso's interest to Lions amounted to a dissolution, no agreement to discharge the general partners

under section 67(2) can be inferred from COIDA's conduct.  Thus, defendants as undischarged

former general partners remain liable for FCA's obligations under the Lease and PILOT

Agreement.

### *Defendants' evidence*

In support of their contention that COIDA's agreement to discharge them may be inferred

from its conduct, defendants rely on the affidavit of Craig S. Harris, Director of Corporate

Development for El Paso Energy Service Co. and custodian of records for El Paso.  The relevant

sections of the affidavit are set forth below.

> 11. By approximately 2002, the former Nestlé chocolate facility was out of operation.
> In October 2003, L. Michael Treadwell, CEcD of Oswego County IDA [COIDA]
> contacted EPME-PC [El Paso] to determine if the Fulton Cogeneration Plant could
> provide steam to the former Nestlé chocolate facility. At that time Mr. Treadwell was
> told that the Fulton Cogeneration Plant was up for sale and that this potential for a
> steam sale would be passed on to the new owner if a sale occurred and that an
> evaluation would be made to determine if steam could be supplied from an economic
> sense.
>
> 12. In early December 2003, a meeting was scheduled between me and Gary Keevill
> with EPME-PC and Oswego County IDA, including Mr. Treadwell, to tell them why
> the [cogeneration] plant was not operating, that the plant was up for sale and that FCA
> needed relief under the PILOT agreement. When Gary and I got to the meeting in
> Fulton, it turned out that the Oswego County IDA had invited others to the meeting.
> Mark U. Hirschey, Principal of Island Capital Ventures, and Mamadou Ahmed
> Diomande, Director of Fiscal Studies of the New York State Senate, in addition to

Mr. Treadwell, Executive Director of Operation Oswego County were present at the meeting. We were told that Dr. Ousmann-A. Gbané[3] Principal and CEO of Lion Capital Management Group was going to attend but could not.

13.... During that meeting we were advised of Oswego County IDA's efforts to reopen the Nestlé plant. What we were told is basically what is contained in the following news releases and other items taken directly off of the Operation Oswego County Website:

  a. January/February 2003: Operation Turnaround Markets Nestlé Plant Internationally

    The ongoing marketing and redevelopment strategy for the Nestlé facility in Fulton took a major step early this year when Operation Oswego County (OOC) contacted more than 800 chocolate manufacturers to investigate any interest that an existing firm may have to acquire the oldest milk chocolate plant in North America.

    In addition to the United States, a Nestlé site specification brochure was mailed to manufacturers in 81 countries including England, Germany, France, Poland, Mexico, Russia, Switzerland, Spain, Canada and Belgium.

  b. March/April 2003: Nestlé: Operation Turnaround Impact Study Results Released: Plant Sale Price of $3.5 Million Termed "Potentially Marketable"

    Treadwell said, "The tour focused on three main objectives which were to obtain authorization to retain a private firm to evaluate the plant for reuse and redevelopment, evaluate the electrical infrastructure, and determine which buildings could be segregated. We need to get the plan approved by the company, but I don't see any problems working with them."

  c. September 30, 2003: Committees Appointed to Deal with Proposed Nestlé Property Transfer

    Oswego County Industrial Development Agency (IDA) Chairwoman Carolyn Rush announced today the appointment of two committees formed in response to the proposed transfer of the vacant Nestlé plant in Fulton from Nestlé USA to the IDA.

  d. November/December 2003: Two Former Fulton Plants: A Back-in-Business Turnaround

    Just six months ago, the picture in Fulton was grim. Two major longtime employers announced plant closings, which was a result in the loss of 580 jobs.

---

[3] Throughout the instant litigation, Dr. Ousmann-A. Gbané refers to himself as "Hausmann-Alain Banet, Ph.D."

Now – in a quick turnabout that is almost unheard of in economic development circles – after months of hard work, negotiation and teamwork, the former Nestlé and Sonoco plants are soon to be operational and back in business.

e. December 15, 2003: IDA Agrees to Acquire Nestlé Plant, Accepts Purchase Offer

The County of Oswego Industrial Development Agency voted unanimously today to acquire the former Nestlé plant in Fulton from Nestlé USA for $100.

f. January 20, 2004: 2003: The Year of Business Turnaround in Oswego County, by L. Michael Treadwell, CE.D, Executive Director of Operations, Oswego County

While the turnaround of the Nestlé and Sonoco plants certainly was the major success story in 2003, small business development proved once again to be the economic development anchor in Oswego County.

14. These discussions and Oswego IDA's orchestration of the take over of the Nestlé Plant and its desire to find a "steam host" for the chocolate operations are further documented by the pertinent Minutes of Oswego. Beginning in 2003, Oswego began discussing in their Board Meetings the "Nestlé Prospects". In fact, the Board Minutes reveal that in or around October of 2003, Nestlé made a proposal to Oswego on donating their property to the IDA. In October of 2003, Oswego's counsel was authorized to negotiate with Nestlé on the transfer.

- In Oswego's October 8, 2003 Minutes, Nestlé has represented to the IDA that it has an agreement with EPME-PC to use steam and also discusses Lion Capital's expressed interest in ownership of part or all of the property at issue. Further, on October 15, 2003, the Board of Oswego authorized action to "initiate discussion with both investor groups on immediate turnover of the property...."

- Oswego actually loaned out $300,000.00 for the Fulton Chocolate Company, Inc. Project (see March 8, 2004 Board Minutes). (This entity later entered into an MOU with The New York Chocolate & Confections Company, another entity [of] Mr. Gbané....) In Oswego's Financing Proposal Summary (see March 8, 2004 Board Minutes), the impact of this project [is] state[d] as follows:

    – Creation of 95 jobs
    – Estimated $4.1 Million in new annual payrolls
    – Assistance to an EZ Business
    – Placing back into use a closed manufacturing facility
    – Multiplier effect (RIMS) additional 306 jobs and $11.3 million in annual earnings.

It is very clear that the turnover of this entire Facility to a new owner was beneficial to the County's economic redevelopment efforts. It is also apparent that the Oswego

-9-

County IDA, and in particular Mr. Treadwell, were the driving force in attempting to put the overall deal together including the conveyance of EPME-PC's partnership interest to Lion Capital, *et al.*

15. It was Oswego who first contacted EPME-PC to discuss steam supply so that they could begin to reopen the Nestlé Plant. At this time, Lion was the new tenant at the Nestlé facility. Thereafter, EPME-PC received calls from Mr. Gbané at Lion and representatives of Oswego County IDA to further discuss steam issues. I believe that Oswego, due to their ownership interests in the Nestlé Property, also owned the equipment located at the Nestlé Plant. On information and belief, the special equipment used for steam at the Nestlé Plant was old and needed many repairs in order to supply the steam necessary to support the Nestlé Plant. Not only would the equipment need to be registered by its new owner (Oswego), but in order to register and use the equipment, it would have to be upgraded per NYSDEC regulations. On information and belief, there were also fears that if the registration did not pass, an entire new tank would have to be purchased at an unknown cost to Oswego.

16. Given these problems with generating steam internally at the Nestlé Plant, Oswego and Mr. Gbané of Lion Capital had many meetings prior to coming to EPME-PC to request an arrangement to use steam from the Fulton Cogeneration Plant. On or about May 17, 2004, [COIDA's Secretary/Treasurer] Mr. Treadwell accompanied Mr. Gbané to the first meeting at our Facility. It was clear that EPME-PC's facility was a fast fix to provide the steam needed for the Nestlé Plant. Due to the poor condition of the steam equipment at the Nestlé Plant, the co-generation facility became a critical piece in the reopening of the Nestlé Plant.

17. Mr. Treadwell states in his affidavit in support of the IDA's Motion for Summary Judgment ... "At no time prior to the transfer of EPME-PC's interest in FCA was COIDA's consent to said transfer requested or given." To the contrary, the assignment was made based on Mr. Treadwell's request at the December 2003 meeting. Mr. Treadwell was insistent that the assignment of the cogeneration plant was necessary for the County's redevelopment efforts and that the chocolate plant could not reopen without EPME-PC's assignment of its interest so the Plant could have a source of steam. It is disingenuous for Mr. Treadwell to imply that consent was required, as under the form of the PILOT Agreement drafted by the IDA, there is NO REQUIREMENT in the PILOT Agreement that the IDA consent to an assignment. Clearly, there can be no dispute that the IDA had full knowledge of the assignment from El Paso to Lion, *et al.*, and in fact, was the one that conceived the plan and brought it to fruition.

18. The IDA's knowledge and approval of the assignment of the partnership interest is well documented and was announced on their own website four days after the transaction was closed. The following news release was on the Operation Oswego County website.

-10-

a. September 27, 2004: Acquisition of Fulton Cogeneration Power Plant Announced

Lion Capital Management Group (LCM), its partner Fimab and Promeneur & Hausmann, Inc., and EPME-Petroleum Merchant Energy North America Company jointly announced that they have reached a definitive agreement for LCM to own and operate the Fulton Cogeneration Association, L.P. (FCA), a subsidiary of El Paso Power Merchant of Houston, Texas:

...

"The sale of the cogeneration facility to Lion Capital Management Group, parent company of New York Chocolate & Confections Company may become very beneficial to the city of Fulton if the company decides to produce electricity.... The company is looking for avenues for electricity right now, said City of Fulton Mayor Daryl Hayden.

The cogeneration plant was originally installed in late 1990 to produce electricity with a $48,500,000 County of Oswego Industrial Development Agency bond currently held by a subsidiary of Lion Capital Management Group as a result of this transaction with a balance of $18,700,000.

According to L. Michael Treadwell, executive director of Operation Oswego County, the acquisition of the FCA facility was always an integral component of the overall redevelopment plan for the former Nestlé facility.

The involvement of Lion Capital Management Group in this project helps strengthen the long-term development of New York Chocolate & Confections Company in Fulton. Also, the potential of business relations with other current and prospective employers, such as Northeast Biofuels, is a tremendous asset for growing the local economy, Treadwell said.

b. September/October 2004: Fulton Co-generation Plant Acquired

The involvement of Lion Capital Management Group [Lions] in this project helps strengthen the longterm development of New York Chocolate & Confections Company in Fulton," said L. Michael Treadwell, CED, Executive Director of OOC [Operation Oswego County, an economic development corporation].

c. October 5, 2004: Clarification, Production Update Issued by New York Chocolate & Confections Company

Last July, NY3C [New York Chocolate & Confections Company] purchased all assets of The Fulton Chocolate Company making NY3C the sole owner and operator of the plant.

-11-

...
NY3C does not own or operate the Fulton Co-generation facility adjacent to the chocolate plant. The facility was recently purchased and will be operated by NY3C shareholder Lion Capital Management Group. During Nestlé's occupancy of the plant, the co-generation facility was owned and operated by El Paso of Huston (*sic*), TX from whom Nestlé purchased steam. Similarly, NY3C intends to continue purchasing its steam from the LCM [Lion]-owned facility as long as pricing remains competitive.

***

20. In addition, the IDA discussed the PILOT in its November 8, 2004 minutes just a month and a half after the sale. "A discussion was held on the change of ownership of Fulton Cogeneration Associates from El Paso to Lion Capital Management. The Secretary/Treasurer [Mr. Treadwell] was authorized to work with the City of Fulton on potential reassessment issues." This was apparently a reference to the fact that since the ... consideration for the assignment from EPME-PC to Lion Capital, *et al* was $1.00 that the market value of the plant was also very low and nowhere near the assessment of approximately $40 million.

21. This was followed up by a later press release pertaining to the particular PILOT Agreement in this case, as follows:

a. April 5, 2005: PILOT Agreement Terms Under Discussion for Cogeneration Facility

The County of Oswego Industrial Development Agency (IDA)is working in cooperation with the City of Fulton, Fulton City School District and the County of Oswego on matters involving a Payment in Lieu of Taxes (PILOT) agreement between the IDA and Fulton Cogeneration Association, L.P. (FCA). Lion Capital Management Group (LCM), its partner Fimab, Promeneur and Hausmann, Inc. recently acquired the Fulton Cogeneration Association, L.P. (FCA) from El Paso of Houston, Texas.

22. The above minutes and news releases are evidence that the IDA had knowledge of this transfer and was looking solely to Lion Capital, et al. I was involved in the entire transaction, and the IDA was a driving force, facilitator, and had clear participation and knowledge of the events at issue in this case. Further, the news releases of the County of Oswego are further evidence supporting my affidavit. It is my opinion that Oswego County's IDA's plan to reopen the Nestlé Plant failed and, because of the failure, the Oswego County IDA is attempting to recast the terms of its understanding with EPME-PC that was made to get the interest in Fulton Cogeneration Associates, LP assigned to Lion Capital, *et al.*

(Citations to record omitted.)  Defendants also state that COIDA did not send either of them a

notice of default when FCA failed to make the March 31, 2005 PILOT payment.

*COIDA's evidence*

In response, COIDA submits affidavits from L. Michael Treadwell, Secretary-Treasurer of COIDA, and Kevin C. Caraccioli, Esq., counsel to COIDA.  Treadwell states as follows:

> COIDA is an industrial development agency that only takes action through its Board of Directors. COIDA's Board never authorized any discharge of Defendant's liability at any time. The Board did authorize litigation against Defendants immediately following Fulton Cogeneration Associates' ("FCA") default on the PILOT and Lease Agreements herein. In addition, neither COIDA, nor I, ever participated in any negotiations or transfer of Defendants' general partnership interest.

> Upon information and belief, following Defendants' transfer of their partnership interest in September, 2004, COIDA and its legal counsel attempted to obtain information from Defendants and their affiliates regarding the details of the assignment, such as, what was paid, and what was transferred. Defendants were not responsive to our requests for information. In fact, as evidenced by the attached e-mail, COIDA's legal counsel could not obtain simple facts regarding the transaction as late as March of 2005 as El Paso's counsel cited confidentiality concerns.

> Upon information and belief, the first time I personally obtained a copy of Defendants' Purchase and Sale Agreement dated September 23, 2004, relating to the assignment of their partnership interests in FCA, was when they disclosed it in connection with their Motion to Dismiss COIDA's Amended Complaint in this litigation which was served on November 14, 2005.

> COIDA did not consent, and could not have consented, to the terms of Defendants' assignment and alleged discharge as COIDA never learned of the terms of Defendants' assignment and alleged discharge until more than a year after the agreement was entered into, and then only in conjunction with this litigation. It is difficult to fathom how anyone can consent to contract terms when they have not been disclosed.

> Upon information and belief, Defendants have requested and received all COIDA Board minutes for the approximately two years leading up to their transfer of interest. Those minutes are devoid of any reference to Defendants' discharge from liability or assignment of partnership interest.

> The COIDA Board never adopted a resolution authorizing the discharge of

Defendants' liability.

Upon information and belief, FCA was in discussions with various parties regarding the provision of steam to the former Nestlé factory, and other steam users, and I at times introduced the parties as part of my regular job responsibilities. However I had no personal knowledge, nor did I ever participate in, any negotiations regarding a transfer of partnership assets or interests.

Moreover, I was never aware that Defendants sought to avoid their contractual obligations under the PILOT and Lease Agreements because that issue was never disclosed to either myself or COIDA. COIDA would have denied any such request because it had an obligation to the taxing authorities to collect all the money owed under the PILOT Agreement.

Paragraph 2.8 of Defendants' Purchase and Sale Agreement ... specifically addresses and acknowledges Defendants' ongoing contractual obligation in regards to the amounts due under the PILOT agreement. At no time was COIDA a party to this written agreement, nor did they consent to the purported allocation or any release of El Paso's obligations under the Lease and/or PILOT Agreement herein.

Defendants also contend in their Cross-Motion that Lion Capital Management was a tenant of the Nestlé corporation and that COIDA was attempting to reopen the Nestlé facility. While the undersigned does not believe these issues are relevant, they nonetheless should be factually accurate.

Contrary to Defendants' contentions regarding the Lion tenancy and COIDA's intentions, Lions was never a tenant of the Nestlé facility. Rather, following a public auction conducted by Nestlé, Lion was permitted additional time to remove equipment housed therein. No tenancy agreement ever existed. Moreover, COIDA never intended to open and operate the facility. Rather, as part of its ongoing efforts to promote economic development in Oswego County, COIDA was working with private entities regarding the possibility of their obtaining and operating the facility.

The Defendants' transfer of interests in FCA, without the benefit of COIDA's actual knowledge or consent, should not act to relieve them from the contractual obligations they bargained for and owe COIDA. ANR and El Paso received, in exchange for those obligations, benefits which were bestowed upon them in the form of economic benefits through lower initial PILOT payments.

(Citations to record and paragraph numbering omitted.)  COIDA sent notice of termination of the

-14-

Lease to ANR and FCA.

The affidavit of Kevin C. Caraccioli, Esq., counsel to COIDA, states:

> Upon information and belief, following Defendants' transfer of their partnership interest in September, 2004, I attempted to obtain information from Defendants and their affiliates regarding the details of the assignment, such as, what was paid, and what was transferred.  Defendants were not responsive to our requests for information.

> Pursuant to the e-mail exchange between myself and an attorney at El Paso ... I could not obtain simple facts regarding the transaction as late as March of 2005, since El Paso's counsel cited confidentiality concerns.

(Paragraph numbering omitted.)

The first of these e-mails, dated March 28, 2005, is from Caraccioli to Sheldon L. Abramson, Esq., an attorney for El Paso.  It bears the subject heading: "Fulton CoGen - Lion Capital Transaction" and reads as follows:

> This message follows our telephone conversation this date.  I represent the Oswego County Industrial Development Agency. I am trying to obtain documentation concerning the transaction with Lion Capital Management (LCM) and Fimab, Promeneur & Hausmann, Inc. for the sale of the Fulton Cogeneration Associates (FCA) facility in Fulton, NY site (adjacent to the former Nestlé facility.)  Any information you or your colleagues can provide me would be most helpful. At issue, among other items, is the status of certain Industrial Development Revenue Bonds that were reportedly transferred to LCM when they took over interest in FCA. My client is attempting to verify the status of these bonds and to learn the details of the transaction for the FCA facility. There is a Payment In Lieu Of Taxes Agreement (PILOT) payment that is currently due for the facility and LCM has indicated an objection to this payment. It would be helpful to know if credits were applied regarding this issue. I have many other issues to address but need to know if you or anyone in the company can assist me as soon as possible. Thank you.

Abramson responded the following day as follows:

> Kevin, I have circulated your request around and will try to get back with you within a relatively short period of time. I will also need to familiarize myself with the specifics of the transaction and your request. Due to confidentiality restrictions, El Paso may need to obtain the consent of Lion Capital to provide

-15-

information to your client. In any event, I will be out of town commencing tomorrow but will try to get you some form of an update next week. Thanks.

Caraccioli responded:

Thanks Shelly. I will wait for further direction from you on this matter. Lion Capital may be reluctant to share this information but frankly, as the issuer of the revenue bonds, believe we have some authority to request the details of this transaction without consent. In fact, the IDA was never put on notice of this transaction despite language in the various 1991 title documents that require notice, etc... We are not trying to be contentious here. We just want some answers to very basic questions that LCM is reluctant to provide. Thanks again.

The final communication in the record is the following response from Abramson:

Kevin, in the interim, I can point you to a publicly available document that should provide a substantial amount of information regarding the transaction. Under Section 203 of the Federal Power Act, the approval of the Federal Energy Regulatory Commission was required for the transfer of certain FERC jurisdictional assets from the El Paso affiliates to Lion Capital and Fimab. I think it would be worth looking at the Section 203 Application that was filed with the FERC on 6/25/04. You can access it fairly quickly on the FERC website at www.ferc.gov. If you do a library text search for key words such as "Lion Capital" it should come up. I will forward to you a copy of the FERC Order, which does reference the Application, under separate cover. Hope this helps.

*Analysis*

On the question of the liability of defendants ANR and El Paso, former general partners of FCA, for FCA's obligations under the Lease and PILOT Agreement, the Court first notes that, under New York law, "[t]he dissolution of [a] partnership does not of itself discharge the existing liability of any partner." N.Y. Partnership Law, § 67(1). A partner may, however, be discharged from liability pursuant to subdivision 2 of section 67, which provides:

A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business; and <u>such agreement may be inferred from the course of dealing between the creditor</u>

-16-

> having knowledge of the dissolution and the person or partnership
> continuing the business.

*Id*., § 67(2) (emphasis added).

On its motion for summary judgment, COIDA argues that, even assuming that El Paso's transfer to Lions of its general partnership interest constituted a dissolution of FCA, such dissolution did not discharge defendants from their obligations to COIDA under the Lease and PILOT Agreement. COIDA asserts that the evidence demonstrates as a matter of law that COIDA did not agree to such a discharge.

In support of their contention that the evidence of COIDA's knowledge and conduct during the relevant time period establishes an implied agreement to discharge defendants under section 67(2), defendants rely primarily on the affidavit, summarized above, of Craig S. Harris, a director of El Paso. Although Harris states that he "was involved in the entire transaction," his affidavit sets forth few factual observations of which he claims to have first-hand knowledge. Rather, it consists primarily of direct quotes from news releases and other items, and conclusory assertions. Viewed in the light most favorable to defendants, Harris' affidavit and the documentary and other evidence submitted by defendants on this issue shows little more than that COIDA wanted the Nestlé plant to reopen; that COIDA encouraged the transfer and reopening of the FC Facility to supply steam to the Nestlé plant; that, in particular, COIDA encouraged El Paso's transfer to Lions of its interest in the FC Facility; and that after El Paso transferred its interest to Lions, COIDA acknowledged the transfer and accepted Lions as an obligor under the Lease and PILOT Agreement.

Defendants' evidence to the effect that COIDA encouraged and had knowledge of El Paso's transfer to Lions of its interest in the FC Facility, even if accepted as true, does not support

-17-

a finding that COIDA impliedly agreed to discharge defendants from their obligations as general

partners in FCA.  In this regard, the Court notes that FCA, a limited partnership, entered into the

Lease and PILOT Agreement for the FC Facility in 1991 and remained obligated thereon until

2005,[4] and that during this time period, the identity of FCA's general partner changed from ANR

to Coastal to El Paso to Lions, and the identity of its limited partner changed at least twice.[5]

There is no evidence that COIDA ever agreed to discharge any general or limited partner

---

[4] COIDA cancelled the Lease as of August 25, 2005.  Defendants contend that Lions effectively cancelled the PILOT Agreement by letter dated January 21, 2005; it is not necessary at this point in the discussion to address the effect of Lions' January 21, 2005 letter .

[5] Specifically, the partnership documents attached to the affidavit of El Paso's representative Craig S. Harris show the following.  The first FCA Limited Partnership Agreement, dated March 15, 1988, stated that FCA had three general partners: ANR, Mercer Companies, Inc., and Turner Power Group, Inc ("Turner"); and three limited partners: ANR, Mercer Fulton Cogeneration Associates, and Turner. On February 27, 1989, FCA filed the first amendment to the limited partnership agreement, in which Turner assigned its general and limited partnership interests to ANR; Mercer Companies, Inc. assigned its general partnership interest to ANR; and Mercer Fulton Cogeneration Associates assigned its limited partnership interest to Coastal Power Production Company ("Coastal Power").  Thus, it appears from the record that in 1991 when FCA entered into the Lease and PILOT Agreement, ANR was the sole general partner, and ANR and Coastal Power were the only limited partners.

On May 7, 1998, FCA's limited partnership agreement was amended to reflect that FCA's sole general partner was "Coastal Refining & Marketing, Inc. d/b/a ANR Venture Fulton Company" ("Coastal") and that FCA's two limited partners were Coastal and Coastal Power.  On November 5, 1998, "The ANR Venture Fulton Company Division of Coastal Refining & Marketing, Inc.," as general partner in FCA, signed a resolution consenting to the acquisition of the Rensselaer Power Project and the Castleton Power Project.

According to defendants, Coastal became El Paso in January 2001.  No document in the record reflects this change.  An officer of El Paso signed a Restated Certificate of Limited Partnership on July 13, 2004, stating that El Paso was FCA's sole general partner.

On September 23, 2004, Dr. Ousmann-Alain Gbané (a/k/a Hausmann-Alain Banet, Ph.D.), as Principal, CIO, and Secretary of Lions, signed a Restated Certificate of Limited Partnership of FCA reciting that the Certificate of Limited Partnership was amended "to reflect the name change of the General Partner" from El Paso to Lions and "to reflect the name change of the Limited Partner" from Rensselaer Plant Holdco, LLC, to Fimab.  The certificate showed Lions as the sole general partner and Fimab as the sole limited partner.

It appears that prior to or during February 2005, Fimab became the sole general partner in FCA.

-18-

throughout this period.  Indeed, there is no evidence that COIDA even knew of the various

changes in the identities of the partners and in FCA's partnership structure, and, in particular, no

evidence that COIDA knew of the changes in partners and partnership structure that accompanied

the transfer of El Paso's interest to Lions.  Evidence that COIDA knew of the transfer to Lions

and accepted Lions as an obligor on the Lease and PILOT Agreement is not evidence that COIDA

knew that Lions had replaced El Paso as sole general partner in FCA, and certainly does not

support a finding that COIDA impliedly agreed to accept Lions as the sole obligor and to release

El Paso and ANR from their obligations.

Nor does the other evidence relied on by defendants support a finding that COIDA

impliedly agreed to discharge defendants.  No such agreement can be inferred from evidence that

COIDA promoted the involvement of Lions, that COIDA believed Lions' involvement would

benefit Oswego County, that COIDA looked to Lions to make the PILOT payments, or that

COIDA did not send defendants notice of Lions' default in making the fourteenth PILOT

payment.  None of this conduct is inconsistent with an intention on the part of COIDA to continue

to hold defendants liable for their obligations under the Lease and PILOT Agreement.

This conclusion is bolstered by the evidence submitted by COIDA in opposition to the

cross motion.  The affidavit of L. Michael Treadwell, an officer of COIDA, establishes by

firsthand  knowledge that COIDA never participated in any negotiations regarding the terms of

the transfer of El Paso's partnership interest and was never consulted regarding such terms; that

COIDA's Board of Directors never authorized a discharge of defendants' liability under the Lease

or PILOT Agreement; that COIDA would have refused any request to authorize such a discharge,

because COIDA was obligated to the taxing authorities to collect all the money owed under the

-19-

PILOT Agreement; and that COIDA did not consent, and could not have consented, to the specific terms of El Paso's transfer to Lions, because COIDA did not learn of these terms until more than a year later, when it received a copy of the Purchase and Sale Agreement during motion practice in this action.  This last point is strongly reinforced by the affidavit of Kevin C. Caraccioli, Esq., COIDA's counsel, authenticating the March 2005 e-mail exchange (set forth above) between himself and El Paso's counsel Sheldon L. Abramson, Esq., in which Caraccioli unsuccessfully sought "documentation concerning the transaction with [Lions and Fimab]... for the sale of the Fulton Cogeneration Associates (FCA) facility[.]"

Viewing the evidence in the light most favorable to defendants, the Court concludes that no rational factfinder could infer from COIDA's conduct an agreement to discharge defendants from their obligations as general partners in FCA.  To the contrary, COIDA has demonstrated the absence of any such implied agreement.  The evidence relied on by defendants does not raise a question of fact on this issue.  COIDA is entitled to summary judgment on the question of defendants' liability as general partners in FCA, and defendants' cross motion for summary judgment insofar as it seeks dismissal of COIDA's claims against them is denied.

**How did FCA's cancellation affect defendants' obligations under the PILOT Agreement?**

Defendants next argue that, even if the Court finds no implied agreement by COIDA to discharge them from their obligations as general partners in FCA, their liability for FCA's obligations is limited to the taxes "otherwise due for the 2004-2005 School fiscal tax year and 2005 city and county fiscal tax year and would have been based on the City's 2004 assessment."

FCA made the March 31, 2004 payment, which was the 13th payment under the PILOT schedule.  El Paso transferred its interest in the FC Facility to Lions on September 23, 2004.  By

-20-

letter to COIDA dated January 21, 2005, Lions stated:

> As you are aware, El Paso Energy Corporation ... has sold its interests in certain power plants, including Fulton Cogeneration Associates, LP ... as an ongoing concern[.]
>
> As part of our overall restructuring process and under the terms of the Payment in Lieu of Taxes Agreement ("Tax Pilot Agreement") made on February 27, 1991, by and between FCA and the County of Oswego Industrial Development Agency, we are hereby withdrawing from the Tax Pilot Agreement, effective immediately.
>
> ... We want to remind ... [COIDA's counsel] and others that Sections <u>FIFTH</u> and <u>SIXTH</u> of the Tax Pilot Agreement do permit cancellation of the Tax Pilot.

FCA made no payment on March 31, 2005, when the 14th payment was due.  By notice to FCA (c/o ANR and Lions) dated July 25, 2005, COIDA accelerated the 15th and final payment due under the PILOT schedule and terminated the lease effective August 26, 2005.[6]

Defendants argue in their memorandum of law:

> [O]nce FCA cancelled the PILOT Agreement, EPME-PC [El Paso] (and even

---

[6] The "Notice of Termination of Lease" sent by COIDA to FCA (c/o ANR and Lions) on July 25, 2005, stated:

> Pursuant to Sections 10.1(a)(l) of the Lease, an Event of Default has  occurred and is continuing under the Lease as a result of the Company's [FCA's] failure to pay the amount specified under Section 6.3(b) thereof [which  incorporated the PILOT by reference].  By letter dated April 29, 2005, the Issuer [COIDA] gave the Company notice that the annual payment under the PILOT Agreement due March 31, 2005 payable pursuant to Section 6.3(b) of the Lease was not paid on the due date therefor. To date, such amount remains unpaid.
> ***
> [P]ursuant to Issuer's rights under 5.8 of the Agency Agreement, the Lease and all rights of the Company thereunder are hereby terminated effective August 26, 2005.
>
> Nothing herein shall be construed to relieve the Company from its obligation to make all payments due under Sections 5.3 and 8.2 of the Lease.
>
> The Issuer hereby reserves all of its rights and remedies both in law and equity. The amounts due or to become due to the Issuer under the Lease are hereby accelerated and demand hereby made for immediate payment of $4,721,849.

FCA), could not have owed any obligations pursuant to the cancelled agreement. Of course, the Lease Agreement continued and FCA continued to owe for taxes, but such payments were no longer based on the cancelled PILOT, they arose annually and were based on actual real property tax rates multiplied against the property's annual assessments.

Significantly, FCA's new annual obligations to make payments to COIDA could not have accrued in 1991 when the Lease Agreement and PILOT Agreement were executed.  Now that the PILOT Agreement was cancelled, such payments were to be based on actual assessments which could not be determined until each annual assessment issued. In other words, the March 31, 2005 payment that would have been due under the PILOT Agreement, but for its cancellation, would have covered the payments otherwise due for the 2004-2005 School fiscal tax year and 2005 city and county fiscal tax year and would have been based on the City's 2004 assessment. Likewise, the earliest the 2006 City and County tax rates were established was late December, 2006 and 2005-2006 School tax rates were not even determined until sometime between August and September, 2005.  And, the real property assessments for the 2005-2006 tax years were not even established on the date of the alleged default. Thus, no obligation could have arisen before the above dates, and once the tax roll, annual assessments and tax rates have been established and calculated for the year. (NY Real Property Tax Law, §§ 302, 520).

(Footnotes omitted.)

In addressing this argument, the Court reviews the relevant terms of the PILOT Agreement.  Paragraphs one, two, and six state:

**FIRST**: As long as the title to the Project Facility is invested in the Agency [COIDA] by form of Leasehold or otherwise, the Company [FCA] agrees to pay to the Agency, directly, an annual sum in lieu of City, County and School District Real Estate Taxes and assessments in accordance with the following schedule:
***     [The PILOT Agreement sets forth a schedule of 15 annual payments increasing every year, from $100,000 in the first year to $1,728,455 in the 15th.]
The Facility being taxed per assessment starting in the Sixteenth (16th) year.

**SECOND**: The Effective date for the commencement of payments pursuant to Paragraph First above, shall be the 31st day of March, 1992 and on the 31st day of March in each succeeding year thereafter.
***

-22-

> **SIXTH**: The Company [FCA] reserves the option to cancel this in lieu of taxes agreement and to pay to the Agency [COIDA] an amount equal to the actual tax assessment which would be due on the property based upon the assessed value fixed by the assessors and the current tax rate applicable for the City, County and School taxes in the area.

(Emphasis added.)  It is clear from these paragraphs that the word "cancel" in paragraph six does not permit FCA to cancel the entire PILOT Agreement such that thereafter the parties are bound solely by the terms of the Lease.  Rather, the word "cancel" in paragraph six authorizes FCA to cancel the schedule of 15 annual payments to COIDA set forth in paragraph one of the PILOT Agreement and to substitute a different manner of calculating the 15 annual payments to COIDA. In other words, upon FCA's exercise of its "option to cancel," the amount of the payment due to COIDA on March 31 in each remaining year of the 15-year period would no longer be the amount set forth in the payment schedule in paragraph one, but rather would be "an amount equal to the actual tax assessment which would be due on the property" as provided in paragraph six.  The Court has already found defendants as general partners liable to fulfill FCA's obligations under the PILOT Agreement and Lease; the Court further finds that, upon cancellation of the schedule of payments, defendants were liable to pay to COIDA on March 31 in each of the two remaining years of the 15-year period an amount equal to the actual tax assessment which would be due on the property.

In determining the amount of these payments, the Court notes that in March 31, 2005, when the 14th payment was due, the "amount equal to the actual tax assessment which would be due on the property" within the meaning of paragraph six was $2,364,399.54, according to tax assessor Dianne Moore.  Moore bases this calculation on the assessed value of the property and the applicable tax rate for 2004-2005, including the school tax for the 2004-2005 school year.

-23-

Further, because FCA defaulted on the payment due March 31, 2005, COIDA sent the July 25, 2005 notice accelerating the payment that would otherwise have been due on March 31, 2006 (the 15th and final payment under the PILOT schedule), and again applied the 2004-2005 tax rate.  As a result, the accelerated March 31, 2006 payment was the same as the March 31, 2005 payment, that is, $2,364,399.54, for a total of $4,728,799.08.

Defendants dispute this method of calculation and argue that the March 31, 2006 payment could not be accelerated because the school tax was not yet known.  The PILOT Agreement and Lease, however, support COIDA's construction.  The construction that defendants put forward would nullify the acceleration clause insofar as it applies to payments "equal to the actual tax assessment" during the first 15 years of the Lease.  That is, under defendants' construction, if FCA exercised its right under paragraph six to cancel the PILOT payment schedule at any time during the first 15 years of the lease, COIDA would have no ability to accelerate the payments upon FCA's default and would have to wait and sue FCA every year once the tax assessments were known.  As the Court reads the PILOT Agreement and Lease, the parties did not intend this result.

In sum, having found that defendants as general partners were liable to pay to COIDA, on March 31 in each of the two remaining years of the 15-year period, an amount equal to the actual tax assessment which would be due on the property, the Court awards COIDA the accelerated March 31, 2006 payment as well as the defaulted March 31, 2005 payment, for a total of $4,728,799.08.

**Must COIDA establish that partnership property is insufficient before it can recover from defendants?**

Defendants argue that COIDA is required to establish its inability to satisfy its claims

-24-

from FCA's partnership property before it can pursue the partners.  Citing *Cunard Line Ltd. v. Abney*, defendants contend that under New York law, "resort may be had against individual partners only if the joint or partnership property is insufficient to pay the firm debts or it appears there can be no effective remedy without resort to individual property."  540 F. Supp 657, 659-60 (S.D.N.Y. 1982).  The rule defendants cite, however, is a rule of pleading, not proof.  *See id.*; *National Union Fire Ins. Co. v. Robert Christopher Assocs.*, 691 N.Y.S.2d 35, 44 (1st Dep't 1999). Where a plaintiff "has named the partnership as a party defendant, along with the individual partners, it is unnecessary to aver the insufficiency of partnership assets to satisfy the claim."  *National Union Fire Ins.*, 691 N.Y.S.2d at 44 (citing *United States Trust Co. v. Bamco 18*, 585 N.Y.S.2d 186, 188 (1st Dep't 1992)).  Having sued FCA as well as defendants, COIDA has met this requirement.

**Did COIDA waive prejudgment interest?**

Defendants next argue that they are not liable for prejudgment interest.  They refer to paragraph 6.3(a) of the Lease and state that they objected to the real property taxes on the FC Facility at the first opportunity, *i.e.*, in their cross-claims against FCA.

Paragraph 6.3(a) reads as follows:

> The Issuer [COIDA] and the Company [FCA] have entered into the PILOT Agreement for the payment of monies to the Issuer in lieu of real estate taxes ... that would but for the Agency holding the Assignment of Ground Lease be imposed by the County of Oswego, the City of Fulton and the City of Fulton School district directly on the Project Facility.  In addition to the payments in lieu of the real estate taxes, as above described, covered by the PILOT Agreement, there may be other amounts payable to taxing jurisdictions or amounts that would but for the Agency holding the Assignment of Ground Lease be taxed or assessed directly on the Project Facility or the Company.  With respect to these other amounts, the Company shall pay when due and prior to the imposition of additional fees or interest as a result of non-payment:

-25-

(1) all taxes or payments in lieu thereof (other than sales taxes on personal property which constitutes part of the Project Facility) and governmental charges of any kind which may be assessed or levied against the Project Facility notwithstanding the Issuer's participation in the Project and all charges made in lieu of them and against any personal property installed or bought on the Project Facility, and
(2) all assessments made against the Project Facility by any governmental body for public improvements as if the Company and not the Issuer were the owner of the Project Facility; <u>provided, however, the Company shall not be required to pay any of the foregoing if (x) the amount, applicability or validity thereof shall be currently contested in good faith by appropriate proceedings</u> or the Company shall have the right to contest the amount, applicability and validity thereof and does so contest by appropriate proceedings within a reasonable period of time and (y) the Company shall have made such reserve or other appropriate provision, if any, as shall be required by the Lender, provided that if the Issuer or Lender reasonably determines that non-payment of such amounts may result in a forfeiture of any material part of the Project Facility or adversely affect the lien of or security interest in any material part of the Project Facility, then the company shall pay such amount or take such action as the Issuer and Lender deem appropriate.

(Emphasis added.)

A plain reading of paragraph 6.3(a) supports COIDA's view that the protection against prejudgment interest in paragraph 6.3(a)(2)(x) applies only to special assessments beyond the ordinary city, county and school taxes covered by the PILOT Agreement. The first sentence of paragraph 6.3(a) refers to payments under the PILOT Agreement. The next sentence notes that there may be other payments due "[i]n addition to" payments under the PILOT Agreement. The third sentence, which introduces subparagraphs (1) and (2), states that FCA shall pay "these other amounts" – *i.e.*, other than the payments under the PILOT Agreement – under the conditions set forth in subparagraphs (1) and (2). Therefore, the Lease provides no ground to depart from settled New York law that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract[.]" N.Y.C.P.L.R. § 5001(a); *accord Adams v. Lindblad Travel, Inc.*,

730 F.2d 89, 93 (2d Cir. 1984) ("Under the law of New York, ... prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.").  COIDA is entitled to recover prejudgment interest.

**Defendants' cross claim**

Finally, defendants ask for summary judgment on their cross claim, set forth in their answer to the amended complaint (Dkt. No. 97) for indemnification against Lions and Fimab. Lions and Fimab interposed no pleading in response to the cross claim, nor did they oppose this motion.  Defendants rely on section 2.8 of the September 23, 2004 Purchase and Sale Agreement between El Paso and Rensselaer as sellers and Lions and Fimab as buyers.  Section 2.8, "Allocation of Property Taxes," provides:

> Sellers and Buyers agree that in the case of property or similar Taxes (including payments in lieu thereof) that are payable with respect to a taxable period that begins before the Closing Date and ends after the Closing Date, (i) Sellers shall be liable for and shall pay the portion of any such Taxes that is allocable to the portion of the period ending on the Closing Date, which shall be deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which the number of days in the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period; and (ii) Buyers shall be liable for and shall pay the remaining portion of such Taxes. To the extent that Sellers have paid or caused to have been paid all or a portion of such Taxes payable by Buyers pursuant to the preceding sentence, Buyers shall reimburse Sellers for such amount at the Closing. To the extent that Buyers have paid or caused to have been paid all or a portion of such Taxes payable by Sellers pursuant to the first sentence of this Section 2.8, Sellers shall reimburse Buyers for such amount within 15 days after [the date] on which such Taxes are paid by Buyers.

By its terms, this section provides for apportionment of real estate taxes, or payments in lieu thereof, for the taxable period in which the closing occurred.  It requires the buyers (Lions and Fimab) to reimburse the sellers (El Paso and Rensselaer) at the closing to the extent that the sellers had paid some or all of the buyers' apportioned share.  At the time of the closing, the

sellers had made the thirteenth payment in lieu of taxes under the PILOT Agreement.  This

payment of $1,254,208 covered the period from March 31, 2004 until March 31, 2005, the date

the fourteenth payment was due.  Read together with the PILOT Agreement, section 2.8 reflects

the parties' intention that this payment should be apportioned such that the seller is responsible

for the 176-day period from March 31, 2004 to the closing date of September 23, 2004, and the

buyer is responsible for the 189-day period from September 23, 2004 to March 31, 2005, the date

the next payment was due.  Thus, at the closing, El Paso and Rensselaer were entitled to be

reimbursed by Lions and Fimab for 51.78 percent of $1,254,208, or $649,428.90.  El Paso has

demonstrated its entitlement to recover this sum from Lions and Fimab based on the Purchase and

Sale Agreement.

Defendants point to no other provision in the Purchase and Sale Agreement in support of

their cross claim, nor do they otherwise demonstrate that they are entitled to indemnification or

contribution in any other amount.  Thus, defendants' cross motion for summary judgment insofar

as it seeks indemnification and/or contribution is granted to the extent that El Paso is awarded

$649,428.90 against Lions and Fimab.

**Attorney's fees**

COIDA moves (Dkt. No. 176) for an award of attorneys' fees and costs.  Under New York

law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in

an action on the contract is enforceable "if the contractual language is sufficiently clear."  *NetJets*

*Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).  Paragraph 10.4

of the February 1, 1991 Lease Agreement between COIDA and FCA provides:

> Agreement to Pay Attorneys' Fees and Expenses. In the event the Company
> [FCA] should default under any of the provisions of this Lease Agreement and

> the Issuer [COIDA] ... should employ attorneys or incur other expenses for the
> collection of amounts payable or the enforcement of performance of any
> obligations on the part of the Company contained in this Lease Agreement,
> the Company shall, on demand, pay to the Issuer ... the reasonable attorneys'
> fees and other reasonable expenses so incurred, whether or not an action or
> proceeding is commenced.

This provision clearly entitles COIDA to recover attorneys' fees and other reasonable expenses against all defendants in the present action.

In awarding attorneys' fees pursuant to a contract, a court must order the losing party to pay the amount actually incurred by the prevailing party, "so long as those amounts are not unreasonable." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987). The Second Circuit mandates that attorneys' fees must be "documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998). In determining the presumptively reasonable amount, a court multiplies the hours reasonably expended on the matter by the hourly fee that a reasonable, paying client would be willing to pay in light of all the relevant circumstances of the case. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183-84, 190 (2d Cir. 2008). Relevant factors in determining the applicable hourly fee include: the complexity and difficulty of the case, the resources required to prosecute the case effectively, the timing demands of the case, and the prevailing rates in the community for similar services by lawyers with comparable skill, experience, and reputation. *See id.* at 184.

In support of its application, COIDA submits affidavits from L. Michael Treadwell, an officer of COIDA, and Robert B. Liddell, Esq., COIDA's counsel and a partner in Hiscock & Barclay, LLP. COIDA also submits the law firm's billing records setting forth the date, time

-29-

spent, and the nature of the work performed by each person who worked on behalf of COIDA in this action. Hiscock & Barclay, LLP enjoys an excellent reputation in Syracuse and the region in commercial litigation, among other fields, and Attorney Robert Liddell specializes in commercial litigation and creditors' rights.

This protracted case presented complex and difficult issues, and extensive resources were required to prosecute the case effectively. The efforts of ANR and El Paso to avoid their contractual obligations as undischarged, former general partners in FCA generated substantial work for COIDA's counsel, as did the litigation conduct of FCA, Lions, and Fimab (*e.g.*, the persistent attempts by Dr. Banet (a/k/a Gbané) to represent FCA, Lions, and Fimab). COIDA's counsel performed exceptional work in locating and protecting assets, in particular the generator and other assets which FCA abandoned at the FC Facility, and the proceeds of a lawsuit, *Fulton Cogeneration Associates, LP. v. The New York Chocolate and Confections Company* (N.Y. Sup. Ct., Oswego Co., Index #1185/05); this work imposed significant timing demands; was largely necessitated by the conduct of FCA, Lions, and Fimab; produced an excellent outcome for COIDA; and provided substantial indirect benefit to ANR and El Paso. Indeed, through counsel's efforts, the Oswego County Sheriff is holding the proceeds of the attached property in the amount of $3,559,964.56, plus interest, for partial satisfaction of COIDA's judgment herein.

The Court has reviewed the billing records in detail and finds them reasonable in all respects, including the time spent preparing the fee application. The objections raised by ANR and El Paso do not warrant a reduction in the allowable time spent. Nor do ANR and El Paso challenge the hourly rates requested, which are consistent with prevailing rates in the community for similar services by lawyers with comparable skill, experience, and reputation. The Court

-30-

finds that all costs and expenses are reasonable.  COIDA's motion (Dkt. No. 176) is granted and it is awarded $271,636.00 attorneys' fees and $521,162.99 in costs.

**The award to COIDA against FCA, Lions, and Fimab**

COIDA is entitled to recover judgment against FCA, Lions, and Fimab in the sum of $4,728,799.08, plus interest from March 31, 2005, plus attorneys' fees of $271,636.00, plus costs of $521,162.99.  The Judgment awarded herein shall amend the prior Judgment (Dkt. No. 174) accordingly.

## CONCLUSION

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 136) by plaintiff, the County of Oswego Industrial Development Agency, against the two remaining defendants in this action, ANR Venture Fulton Company and El Paso Merchant Energy-Petroleum Company, is granted; and the County of Oswego Industrial Development Agency shall recover from ANR Venture Fulton Company and El Paso Merchant Energy-Petroleum Company the sum of $4,728,799.08, plus interest from March 31, 2005, plus attorneys' fees and costs as set forth in the next ordering paragraph; and it is further

ORDERED that the motion (Dkt. No. 176) for attorneys' fees and costs is granted, and the County of Oswego Industrial Development Agency shall recover attorneys' fees in the sum of $271,636.00, plus costs of $521,162.99; and it is further

ORDERED that Judgment shall enter accordingly for the County of Oswego Industrial Development Agency against ANR Venture Fulton Company and El Paso Merchant Energy-Petroleum Company in the sum of $4,728,799.08, plus interest from March 31, 2005, plus

attorneys' fees of $271,636.00, plus costs of $521,162.99; and it is further

ORDERED that the Judgment entered herein shall amend the prior Judgment (Dkt. No. 174), entered April 8, 2009, to award to the County of Oswego Industrial Development Agency $4,728,799.08, plus interest from March 31, 2005, plus attorneys' fees of $271,636.00, plus costs of $521,162.99, against defendants Fulton Cogeneration Associates, L.P.; Lions Capital Management, LLC, a/k/a Lion Capital Management, LLC; and Fimab, Promeneur & Hausmann, Inc.; and it is further

ORDERED that the cross motion for summary judgment (Dkt. No. 142) by ANR Venture Fulton Company and El Paso Merchant Energy-Petroleum Company is granted to the extent that they are awarded indemnification in the sum of $649,428.90 on the cross claim against defendants Lions Capital Management, LLC, a/k/a Lion Capital Management, LLC, and Fimab, Promeneur & Hausmann, Inc., and the cross motion is otherwise denied.

IT IS SO ORDERED.

Date:   July 16, 2009
        Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

-32-